# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ALA MOHAMMAD, | ) |
|    Plaintiff, | ) |
|       v. | )    07 C 6587 |
| | ) |
| CITY OF CHICAGO, | ) |
|    Defendant. | ) |

## MEMORANDUM AND ORDER

Plaintiff Ala Mohammad is a Muslim male of Middle Eastern and Arab ancestry, and a former probationary police officer with the Chicago Police Department ("CPD"). Contending that the CPD wrongfully terminated him and retaliated against him, Mr. Mohammed filed suit against the City of Chicago, asserting Title VII discrimination and retaliation claims based on his race, color, religion, and national origin as well as a § 1981 claim based on his race and ancestry. The City has moved to dismiss portions of Mr. Mohammad's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, Mr. Mohammed's § 1981 claim is dismissed without prejudice, his request for punitive damages is stricken, and the remainder of the City's motion is denied.

**I.    Background**

The following facts are drawn from the amended complaint and will be accepted as true for the purposes of the City's motion to dismiss. Mr. Mohammad is a Muslim male of Middle-Eastern origin and Arab ancestry. He was hired as a police officer by the CPD in November of 2004 and began the required probationary period. Mr. Mohammed's service as a probationary officer was uneventful until March of 2005, when Mr. Mohammad and a number of his coworkers attended a Terrorism Awareness Response Academy ("TARA") training session administered by the CPD. During the training session, the attendees saw a movie of, among

other things, media coverage of events relating to the September 11, 2001, terrorist attacks. During the presentation of the movie, Mr. Mohammad's coworkers asked where he was from and one coworker asked him, "[w]hy do you fly planes into buildings and hate America so much?"

In May of 2006, Mr. Mohammed's coworkers and supervisors attended another TARA training sessions and watched the same movie shown during the 2005 session. When they returned from training, a coworker asked Mr. Mohammad why "you" (*e.g.*, Muslims) blow yourselves up. Several weeks later, Mr. Mohammad saw Sergeant Kamenjarin, one of his superiors, and in front of at least ten officers, Sergeant Kamenjarin told Mr. Mohammad that he saw him or his twin in the TARA movie, except that the individual in the movie had bombs strapped to him and was praising Allah before launching a suicide attack. Sergeant Kamenjarin also told Mr. Mohammad to "let [him] know when you people are planning another bombing so I can get the [expletive deleted] away from there," "I have seen your cousins trying to blow themselves up," and "[y]ou would make a good terrorist." These comments opened the door for Mr. Mohammad's other coworkers to make similar derogatory remarks towards him.

Mr. Mohammad eventually reported these comments to his superiors, who responded by telling him not to make waves while he was on probation or he would be fired. Mr. Mohammed also asked to be transferred to another district after his probation was over due to unspecified personal reasons. Shortly thereafter, on May 25, 2006 (four days before the end of Mr. Mohammed's probationary period), Matthew Tobias (CPD's Assistant Deputy Superintendent) called Mr. Mohammad to his office. While sitting in the waiting room, Mr. Mohammad overheard one of the officers in Assistant Deputy Superintendent Tobias' office state, "I'm going to get rid of that terrorist. He's probably in Al-Qaeda anyways."

Assistant Deputy Superintendent Tobias met with Mr. Mohammad to address his possession of an unregistered weapon that had been recovered from his home during an OPS investigation. Mr. Mohammed contends that he sold the gun to a friend and was keeping it locked in his home during the friend's move. According to Mr. Mohammed, he could not register the gun because it did not belong to him. Mr. Mohammed showed Assistant Deputy Superintendent Tobias documentation regarding the sale and also noted that he had voluntarily turned the gun over to the Internal Affairs Department. Nevertheless, Assistant Deputy Superintendent Tobias terminated Mr. Mohammed based on his possession of an unregistered firearm.

Mr. Mohammad then filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that he was subject to a hostile work environment and unjustly terminated for being Muslim and Palestinian. Specifically, the charge states:

> I was hired by Respondent on or about November 29, 2004. My most recent position was Police Officer. Throughout my employment I have been subjected to harassment in the form of demeaning and derogatory comments based on my national origin and religion by co-workers and supervisors. I have repeatedly objected to the comments to no avail. In addition, I was required to view and Respondent routinely uses a video in its Terrorism Training class that stereotypes Muslims and Arabs, and which created a hostile work environment for me. In or about May 25, 2006, I was unjustly discharged.
>
> I believe I have been discriminated against because of my national origin, Palestinian, and religion, Muslim, in violation of Title VII of the Civil Rights Act of 1984, as amended.

In the portion of the form asking for the earliest and latest dates of the alleged discrimination, Mr. Mohammed stated that the earliest date was April 1, 2006, and the latest date was December 21, 2006. Mr. Mohammad received a right to sue letter on August 29, 2007, and filed suit in federal court. In Count I, which is based on Title VII, he alleges that he was the

victim of discrimination and harassment based on his race, color, religion, and national origin. In turn, Count II seeks relief under § 1981 due to the CPD's alleged race and ancestry discrimination.

## II. Discussion

### A. Standard on 12(b)(6) Motion to Dismiss

A plaintiff's complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief" and "fair notice" of the plaintiff's claims and the basis for those claims. Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, — U.S. —, 127 S.Ct. 1955, 1964 (2007). According to the Seventh Circuit, this language imposes two hurdles. First, the complaint must describe the claim in sufficient detail to give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *E.E.O.C. v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007), *quoting Bell Atlantic Corp. v. Twombly*, 127 S.Ct. at 1964. Second, the factual allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court." *Id.*

The court, however, is neither bound by the plaintiff's legal characterization of the facts, nor required to ignore facts set forth in the complaint that undermine the plaintiff's claims. *See Scott v. O'Grady*, 975 F.2d 366, 368 (7th Cir. 1992). The court must also assume the truth of all well-pleaded fact, construing the allegations liberally and viewing them in the light most favorable to the plaintiff. *See, e.g., McMath v. City of Gary*, 976 F.2d 1026, 1031 (7th Cir. 1992).

B.  Title VII

The City argues that Mr. Mohammed's Title VII race and color claims as well as his retaliation claims are beyond the scope of his EEOC charge. It also seeks dismissal of all Title VII claims based on events occurring outside the time period identified in the EEOC charge (April 1, 2006 – December 21, 2006). For the following reasons, the court rejects the City's arguments about the scope of Mr. Mohammed's charge and the statute of limitations.

1.  Scope of the Charge

In Mr. Mohammad's EEOC charge, he alleged that the CPD discriminated against him based on religion and national origin. However, when he filled out his EEOC charge, he did not check the boxes for discrimination based on religion and national origin or indicate that he believed that the CPD had retaliated against him. The City thus argues that Mr. Mohammed's race and color claims, as well as his retaliation claim, are outside the scope of his EEOC charge.

A plaintiff may not raise claims in federal court which are outside the scope of one of the claims in his underlying charge. *See, e.g., Conner v. Illinois Department of Natural Resources*, 413 F.3d 675, 680 (7th Cir. 2005) ("[a]n aggrieved employee may not complain to the EEOC of only certain instances of discrimination and then seek judicial relief for different instances of discrimination"). The court, however, reads charges broadly. *See Babrocky v. Jewel Food Co.*, 773 F.2d 857, 864 (7th Cir.1985) (directing courts to construe EEOC charges broadly "to effectuate the remedial purposes of Title VII, which itself depends on lay persons, often unschooled, to enforce its provisions").

To be considered within the scope of the charge, the complained of conduct must be "like or reasonably related to" the conduct described in the EEOC charge. *Harper v. Godfrey Co.*, 45 F.3d 143, 148 (7th Cir. 1995). This requirement stems from the fact that most agency charges

are prepared by laypeople, not lawyers. Thus, a plaintiff need not allege each and every fact supporting the basis of each and every claim. *Id*. Instead, claims in a complaint are not barred, even if they did not formally appear in the underlying agency charge, if they are reasonably related to the claims in the charge and "can reasonably be expected to grow out of an [agency] investigation of the allegations in the charge." *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). With these basic principles in mind, the court turns to whether Mr. Mohammed's current race and color claims and his retaliation claim are within the scope of his EEOC charge, which asserts that CPD discriminated against Mr. Mohammed based on his national origin (Palestinian) and religion (Muslim).

### a. Race/Color Claims

"National origin" is "the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973). "Clearly, the term 'national origin' is not synonymous with race or color. Nonetheless, a particular national origin can be reasonably understood to indicate a particular race or color in some instances, such as where the populace of that nation is overwhelmingly of a single race or color." *Oranika v. City of Chicago*, No. 04 C 8113, 2005 WL 2663562, at *2 (N.D. Ill. Oct. 17, 2005) (internal citations omitted).

Here, Mr. Mohammed identified his national origin as Palestinian. The U.S. Department of State does not identify Palestine as a country and Palestine has observer status at the United Nations. *See* United States Department of State List of Independent States in the World, available at http://www.state.gov/s/inr/rls/4250.htm (last visited October 6, 2008), and http://www.un.int/palestine/status.shtml (last visited October 6, 2008). Moreover, the State

Department refers to the West Bank and the Gaza Strip as Palestinian Territories. *See* http://www.state.gov/p/nea/ci/c25609.htm (last visited October 6, 2008).

Construing the allegations in the complaint in the light most favorable to Mr. Mohammed, the court must determine if Mr. Mohammed's statement that the CPD discriminated against him due to his "national origin, Palestinian, and religion, Muslim" could reasonably be understood to encompass discrimination based on race and color. The World Fact Book prepared by the Central Intelligence Agency indicates that the ethnic groups residing in the West Bank consist of 83% "Palestinian Arab and other" and 17% Jewish. *See* https://www.cia.gov/library/publications/the-world-factbook/geos/we.html (last visited October 6, 2008). In terms of religion, 75% of residents are Muslim (predominantly Sunni), 17% are Jewish, and 8% are "Christian and other." *Id*. In turn, Palestinian Arabs comprise 100% of the Gaza Strip's population. *See* https://www.cia.gov/library/publications/the-world-factbook/geos/gz.html (last visited October 6, 2008). 99.3% of these residents are Muslim (predominantly Sunni) and .07% are Christian.[1]

Although the Seventh Circuit has not addressed this question, the majority view is that "race and national origin discrimination claims may substantially overlap or even be indistinguishable depending on the specific facts of the case." *Deravin v. Kerik*, 335 F.3d 195, 202 (2d Cir. 2003) (collecting cases and noting that "even in the absence of an express linkage between race and national origin, the specific facts alleged by a plaintiff in his or her EEOC complaint may suggest both forms of discrimination, so that the agency receives adequate notice

---

[1] The 2007 census for the Palestinian Territories would arguably contain helpful information regarding ethnicity and religion. Regrettably, however, the census appears to be available only in cursive Arabic.

to investigate discrimination on both bases"); *see also Oranika v. City of Chicago*, 2005 WL 2663562, at *4 (because "nothing in the Complaint suggests that the people of Nigeria are not of meaningfully uniform color and race . . . an allegation of discrimination on the basis of being Nigerian strongly implies discrimination on the basis of color and race" so "it can reasonably be expected that an EEOC investigation of [the plaintiff's] national origin discrimination claim would lead to an investigation of race and color discrimination").

Here, reading the complaint broadly, the allegations of discrimination based on being Palestinian implies discrimination on the basis of color and race given the extremely high percentage of Palestinian Arabs residing in the West Bank and the fact that the Gaza Strip appears to be populated entirely by Palestinian Arabs. Moreover, Mr. Mohammed's EEOC charge specifically alleges that the CPD's use of "a video in its Terrorism Training class that stereotypes Muslims and Arabs" created a hostile work environment. The explicit reference to the CPD's allegedly discriminatory treatment of Arabs is synonymous with Mr. Mohammed's current phrasing of this claim as based on race and color. Accordingly, the City's motion to dismiss Mr. Mohammed's race and color claims as outside the scope of his EEOC charge is denied.[2]

---

[2] The court notes that this ruling is interlocutory and based on the information that is available at this time. The City will "have the opportunity to argue at summary judgment or trial that the racial composition of the people of [Palestine] is sufficiently diverse that this case falls outside the parameters of the authorities cited above (as well as to advance any other appropriate arguments at the summary judgment stage and/or at trial)." *Oranika v. City of Chicago*, 2005 WL 2663562, at *4 n.3. Nevertheless, at this stage in the proceedings, dismissal under Rule 12(b)(6) is inappropriate.

### b. Retaliation

The court next turns to whether Mr. Mohammed's retaliation claim exceeds the scope of his charge which expressly alleged discrimination on the basis of his national origin and religion. Mr. Mohammad concedes that he did not check the box labeled "retaliation" on his EEOC charge. Nevertheless, he notes that in the narrative section of his EEOC charge, he asserted that he was subject to harassment by his coworkers and supervisors based on his national origin and religion, he complained, and he eventually was fired. According to Mr. Mohammad, this explicitly stated chain of events (harassment, his complaints about the harassment, and his subsequent termination) creates an inference that he was terminated in order to retaliate against him after he complained about the alleged discrimination.

As a general rule, "retaliation, sex discrimination, and sexual harassment charges are not 'like or reasonably related' to one another to permit an EEOC charge of one type of wrong to support a subsequent civil suit for another." *Sitar v. Indiana Dept. of Transp.*, 344 F.3d 720, 726 (7th Cir. 2003). "Those different claims may be so linked, however, where they are so related and intertwined in time, people, and substance that to ignore that relationship for a strict and technical application of the rule would subvert the liberal remedial purposes of the Act." *Id*. (internal quotation and citation omitted).

In this regard, the Seventh Circuit's decision in *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535 (7th Cir. 2002), is instructive. In *Peters,* the district court found that the plaintiff's retaliation claim exceeded the scope of his EEOC discrimination charge. *Id*. at 550. The Seventh Circuit affirmed, stating that, the plaintiff's EEOC "charge makes no mention of a complaint of discrimination, to whom the complaint was made or what adverse action allegedly resulted from the complaint." *Id*.; *see also O'Rourke v. Continental Cas. Co.*, 983 F.2d 94, 97

(7th Cir. 1993) (plaintiff who asserted a claim of age discrimination in his EEOC charge could not proceed with a retaliation claim because "'[re]taliation" is shorthand for 'adverse consequence deliberately attached to the exercise of a right protected by law' [and t]he charge did not identify the exercise of a protected right or any adverse consequence"); *Bilal v. Rotec Indus.*, No. 03 C 9220, 2004 WL 1244021, at *3 (N.D. Ill. Jun. 3, 2004) (retaliation claim was outside scope of EEOC charge where there was "no trace in the EEOC charge of the retaliatory conduct that . . . [plaintiff] cites in her complaint, no hint of any grievances lodged with her employer or any agency that could be reasonably inferred to be statutorily protected activity, and no inference of causation to be made from the charges lodged with the EEOC").

Here, the City argues that discrimination and retaliation are unrelated as a matter of law. This argument misses the mark, as the court must read the charge carefully to consider whether it identified the exercise of a protected right and a resulting adverse consequence. Mr. Mohammad's charge meets this standard because he alleged that he complained about discrimination and was fired.

Moreover, the events underlying the retaliation charge (Mr. Mohammed's complaints to his superiors about the alleged workplace harassment) and Mr. Mohammed's termination are detailed in the charge. Thus, the retaliation claim is "reasonably related to the claims in the charge" and could "reasonably be expected to grow out of an [agency] investigation of the allegations in the charge." *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d at 500. The City's motion to dismiss Mr. Mohammed's retaliation charge is, therefore, denied.

### 2. Time-Barred Claims

In Mr. Mohammad's EEOC charge, he stated that the complained-of actions took place from April 1, 2006 through December 21, 2006. Focusing on these dates, the City argues that

Title VII claims based on events occurring outside the time period identified in the EEOC charge – specifically, any claims based on the March 2005 video incident – should be dismissed as untimely.

It is true that this incident occurred more than 300 days prior to the filing of Mr. Mohammed's EEOC charge. See 42 U.S.C. § 2999e-5(e)(1). Nevertheless, a plaintiff who, as here alleges a hostile work environment claim may proceed if "all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002). Moreover, the Seventh Circuit has approved the use of "time-barred acts as support for a timely claim," explaining that even "[o]n claims other than hostile work environment claims, acts outside the statutory time period cannot be the basis for liability, but the statute does not 'bar an employee from using the prior acts as background evidence in support of a timely claim.'" *West v. Ortho-McNeil Pharmaceutical Corp.*, 405 F.3d 578, 581 (7th Cir. 2005), *quoting Morgan* at 113.

The City contends that the March 2005 video incident is "remote and attenuated to the other allegedly discriminatory acts plaintiff claims constitute his hostile work environment claim." Reply at 7. This assertion is puzzling, given that the same exact video was shown in May of 2006 as part of TARA training sessions. Mr. Mohammed alleges that he was the target of remarkably similar discriminatory comments and actions after both showings of the video. Mr. Mohammed's complaint also contains details about additional similar acts of discrimination based on the alleged treatment of him as a terrorist in the workplace. The court thus rejects the City's attempt to transform the 2005 video incident into a time-barred isolated act of discrimination.

### C. Section 1981

The City contends that Mr. Mohammed cannot state a claim under § 1981 because he was an at-will employee. Alternatively, it asserts that even if he can file suit under § 1981, he cannot state a constitutional claim against the City because he has not alleged that he was injured due to a City practice, policy, or custom. For the reasons discussed below, the court rejects the City's at-will employment argument but agrees with the City's alternative argument and thus dismisses Mr. Mohammed's § 1981 claim.

#### 1. At-Will Employment

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The City argues that because Mr. Mohammad was a probationary employee, he had no contractual right to continued employment and thus cannot sue under § 1981. The Seventh Circuit, however, has held that "at-will employment, though capable of being terminated by either party at any time, is nonetheless a contractual relationship" that can support a claim under § 1981. *Walker v. Abbott Lab*., 340 F.3d 471, 476 (7th Cir. 2003).

The City attempts to distinguish the Seventh Circuit's opinion in *Walker* by arguing that it limited the class of at-will employees who could file suit under § 1981 to plaintiffs asserting claims of discrimination in promotion and pay. This reading of *Walker* is not supported by anything in the Seventh Circuit's opinion. Indeed, in *Walker,* the Seventh Circuit expressly states that "a finding that at-will employees cannot state a § 1981 claim would appear to contravene Congress's intention in the Civil Rights Act of 1991 to 'restor[e] the broad scope of Section 1981 [to] ensure that all Americans may not be harassed, *fired* or otherwise

discriminated against in contracts because of their race.'" *Id*. at 477, *quoting* H.R. Rep. No. 102-40(II), at 2 (1991) (emphasis added). The City's motion to dismiss Mr. Mohammed's § 1981 claim based on his at-will employment status is, therefore, denied.

### 2. Injuries from a City Policy, Practice, or Custom

To prevail on a § 1981 claim against a municipality, Mr. Mohammad must show that: (1) an express municipal policy deprived him of a constitutional right; (2) a widespread municipal practice exists that, although not authorized by written law and express policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) his constitutional injury was caused by a person with final policy-making authority. *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). The City contends that even if Mr. Mohammed can state a § 1981 claim despite his at-will employment status, this claim fails as a matter of law because the complaint does not allege that a City policy, practice, or custom caused his injuries.

In response, Mr. Mohammed points to the fact that the TARA video was shown twice. He also notes that when he complained about the video, he was told not to make waves while he was on probation or "they will find a way to fire you." According to Mr. Mohammed, "they" are unspecified people with policy-making authority. Finally, he asserts that Assistant Deputy Superintendent Tobias fired him, and that given Assistant Deputy Superintendent Tobias' position, he necessarily must have policy-making authority for the police department.

The court disagrees. Two incidents of alleged discrimination against a single person fail to show the existence of a City policy, practice, or custom. *See Monell v. New York Department of Social Services*, 436 U.S. 658 (1978) (municipalities are not vicariously liable for the constitutional torts of their agents); *Sapienza v. Forest Preserve Dist. of Cook County*, No. 06 C

5599, 2007 WL 4591979, at *5 (N.D. Ill. Dec. 28, 2007) (plaintiff's allegations regarding his allegedly discriminatory interaction with employees of the Cook County Forest Preserve were insufficient to impose liability under *Monell*).

Moreover, the statement that "they will find a way to fire you" does not support the conclusion that "they" are people with policy-making authority. Instead, Mr. Mohammed's gloss on the allegations in the complaint is speculative and thus insufficient. *See E.E.O.C. v. Concentra Health Services, Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (a complaint's allegations "must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'").

Finally, Mr. Mohammed's contention that Assistant Deputy Superintendent Tobias has policy-making authority for the police department is inconsistent with controlling Seventh Circuit precedent. *See Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992) (the "Superintendent of Police in Chicago had no power to countermand the statutes regulating the operation of the department"); *Beal v. City of Chicago*, No. 04 C 2039, 2007 WL 1029364, at *14 (N.D. Ill. Mar. 30, 2007) (the City Council and the Police Board are authorized to set municipal policy for the CPD). If the Superintendent of Police is not a final policymaker with respect to the CPD, then the Assistant Deputy Superintendent also cannot be a final policymaker. Accordingly, Mr. Mohammed's § 1981 claim against the City is dismissed without prejudice for failure to allege the existence of a City custom, policy, or practice.

**D.** **Retaliation**

Both Title VII and § 1981 prohibit retaliation against individuals who oppose discrimination. 42 U.S.C. § 2000e-3(a); *Hunter v. Allis Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1420 (7th Cir. 1986). The City seeks to dismiss Mr. Mohammed's retaliation claim under

both Title VII and § 1981, arguing that he has failed to allege a causal connection between his complaints about alleged discrimination and his discharge.

The complaint, however, includes the allegation that the proffered reason for Mr. Mohammed's termination (possession of an unregistered firearm) was pretextual because while Mr. Mohammed was sitting in the waiting room waiting to meet with Assistant Deputy Superintendent Tobias, he heard one an officer in Assistant Deputy Superintendent Tobias' office state, "I'm going to get rid of that terrorist. He's probably in Al-Qaeda anyways." This allegation is enough to survive a motion to dismiss, so the City's motion to dismiss the retaliation claims is denied.

### E. Title VII & Section 1981 Claims for Punitive Damages

Mr. Mohammed's complaint requests punitive damages. In his response to the motion to dismiss, Mr. Mohammed concedes that this claim should be dismissed. It is thus stricken with prejudice.

### III. Conclusion

For the reasons set forth above, the City's motion to dismiss [#28] is granted in part and denied in part. Specifically, Mr. Mohammed's § 1981 claim against the City is dismissed without prejudice for failure to allege the existence of a City custom, policy, or practice. Consistent with this order and counsel's Rule 11 obligations, Mr. Mohammed may amend his § 1981 claim. Any amended complaint must be filed by December 1, 2008. In addition, Mr. Mohammed's request for punitive damages is stricken with prejudice. The remaining relief requested by the City is denied.

DATE: October 6, 2008

                                                 Blanche M. Manning
                                                 United States District Judge